UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| J L COX, | § | |
| | § | |
|      Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:13-CV-151 |
| | § | |
| WILLIAM  STEPHENS, *et al*, | § | |
| | § | |
|      Defendants. | § | |

**MEMORANDUM OPINION AND ORDER ON
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

In this prisoner civil rights action, Plaintiff J.L. Cox challenges certain policies and practices of the Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ-CID) that he claims conflict with his right to practice his Native American faith in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq*., and the First Amendment.  Plaintiff seeks injunctive and declaratory relief against the TDCJ-CID, by and through Defendants in their official capacities only, to: (1) allow Plaintiff to grow his hair and not be required to keep it trimmed around the ears and neck as required by the TDCJ grooming policy; (2) allow Plaintiff to wear his medicine bag at all times; and (3) allow Plaintiff to possess his own personal prayer pipe and allow him to smoke it during sacred pipe ceremonies. (D.E. 1, pp. 6-7).  Plaintiff is also suing Clint Morris (Defendant Morris or Morris), the TDCJ-CID Native American Program Analyst, in his individual capacity under the First Amendment, alleging that Defendant Morris personally violated Plaintiff's rights when

he failed to provide sacred pipe ceremonies at the McConnell Unit prior to TDCJ's ban on communal pipe smoking in July 2012. (D.E. 1, p. 7-8).

Pending is Defendants' motion for summary judgment to deny Plaintiff Cox's claims. (D.E. 37). Plaintiff has filed responses in opposition to the motion, (D.E. 47, 56), and Defendants have filed a reply. (D.E. 52).

For the reasons set forth below, the Court finds that the TDCJ-CID's practices and policies at issue in this lawsuit do impose a "substantial burden" on Plaintiff's free exercise of his religious beliefs in violation of RLUIPA. However, the Court finds the challenged TDCJ-CID policies and practices are the least restrictive means of providing religious freedom to Plaintiff, while simultaneously maintaining the TDCJ-CID's compelling penological interests in security and safety within mandated budget constraints. Further, Plaintiff's allegations do not establish constitutional violations under the First Amendment. Consequently, the Court **GRANTS** Defendants' motion for summary judgment and **DISMISSES with prejudice** Plaintiff's claims for injunctive relief under RLUIPA and the First Amendment. Finally, the Court **DISMISSES with prejudice** Plaintiff's claims for money damages against Defendant Morris in his individual capacity because Morris is entitled to qualified immunity.

## I.   JURISDICTION.

The Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## II.    PROCEDURAL BACKGROUND.

Plaintiff is a prisoner in the TDCJ-CID and is currently confined at the McConnell Unit in Beeville, Texas.   Plaintiff has been in TDCJ custody since 1994, serving three concurrent forty-year sentences.   He is in general population and lives in a dorm-like setting, not a cell.

On May 28, 2013, Plaintiff filed his original complaint.   (D.E. 1).   He named as defendants: (1) Rick Thaler, the former TDCJ-CID Director who was subsequently replaced by the current Director, William Stephens; and (2) Native American Program Analyst, Clint Morris.  (D.E. 1, p. 3).

On July 9, 2013, a *Spears*[1] hearing was conducted, and on July 15, 2013, United States Magistrate Judge Jason Libby recommended that Plaintiff's First Amendment and RLUIPA claims for injunctive relief against Defendants Stephens and Morris in their official capacities be retained, but that Plaintiff's First Amendment claims against Morris be dismissed for failure to state a claim.  (D.E. 14).   On July 22, 2014, Plaintiff filed an objection to the recommendation, arguing that he had stated a cognizable First Amendment claim against Morris in his individual capacity.  (D.E. 16).   Plaintiff argued that, prior to the TDCJ's 2012 ban on communal pipe smoking, offenders were allowed to partake in the communal pipe.   However between 2009 and 2012, Defendant Morris failed to provide adequate personnel to conduct pipe ceremonies, effectively violating

---

[1] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

Plaintiff's right to practice his religion under the First Amendment over that three year period.  (D.E. 16).

On September 11, 2013, the Court adopted the recommendation to retain Plaintiff's RLUIPA and First Amendment claims against Defendants in their official capacities. (D.E. 21).  In addition, the Court sustained Plaintiff's objection to the recommendation and allowed Plaintiff's First Amendment claim for damages against Morris in his individual capacity to go forward.  (D.E. 21).

On August 29, 2013, Defendants filed their Answer and asserted their entitlement to qualified immunity.  (D.E. 18).  Also on August 29, 2013, Defendant Morris filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  (D.E. 17).  On January 22, 2014, the Court denied Defendant Morris's dismissal motion finding that Plaintiff had alleged sufficient facts for purposes of 28 U.S.C. § 1915A screening to avoid a Rule 12(b)(6) dismissal.  (D.E. 26).

On June 11, 2014, Defendants filed the instant motion for summary judgment.  (D.E. 37, 38, 39, 40, 42).

Following an extension of time, on August 25, 2014, Plaintiff filed his response in opposition to Defendants' summary judgment motion.  (D.E. 47).

Following an extension of time, on December 22, 2014, Defendants filed a reply to Plaintiff's response.  (D.E. 52).

On February 20, 2015, Plaintiff filed an additional response.  (D.E. 56).

III.    SUMMARY JUDGMENT EVIDENCE.

A.    **Evidence related to Plaintiff's faith and claims.**

Plaintiff is of Choctaw descent.  (D.E. 37-2, p. 3).  He was raised Pentecostal; however,

when he arrived at the McConnell Unit, he began studying the faith of his ancestors under

an elder named "Old One."  (D.E. 37-2, p. 4).  In 2005, Plaintiff considered himself to be

a practitioner of the Native American faith. [2]  (D.E. 37-2, p. 4).  On March 11, 2008, the

TDCJ Chaplaincy Department file noted that Plaintiff's religious preference was Native

American.  (D.E. 37-3, p. 4).

On December 10, 2012, Plaintiff filed a Step 1 grievance, Grievance No. 2013058735,

complaining that certain TDCJ policies were interfering with his ability to exercise his

Native American faith.  (D.E. 37-1, pp. 7-8).  Plaintiff stated that it was one of the tenets

of his faith to continually grow his hair and to cut it only in times of mourning as a sign

of respect for the deceased.  He claimed that the TDCJ's mandate of requiring short hair

trimmed above the ears interfered with this practice, and he sought an exemption from

the grooming policy.  (D.E. 37-1, pp. 7-8).  Plaintiff alleged further that it was his belief

that wearing a medicine bag containing certain sacred items protected him from evil

---

[2] It is acknowledged that neither the term "Native American faith" nor "Native American religion" adequately represents the defined belief system of Plaintiff Cox or any particular Native American practitioner because the faith encompasses a wide range of beliefs from different tribes and regions.  (Affidavit of Chari Bouse, Contract Native American Chaplain, D.E. 38-12, p. 4, noting: "Currently, there are 565 federally recognized tribes . . . Each tribe has its own specific customs and traditions.  However, there are several 'inter-tribal' customs, and even that varies in tribes from different states.  Native Americans are not religious by nature, but adhere to what we call a 'way of life.'  Our people are monotheistic, meaning we recognize only one Creator God or Deity.").  A running similarity in the Native American faith system is the central relationship of human beings, and their bodies, to the land, nature, reality, and spirituality.  *See Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 460-61 (1988) (J. Brennan, dissenting).

spirits, and he challenged the TDCJ policy that limited his wearing of the medicine bag to his cell area and circle ceremonies only.  Finally, Plaintiff requested that he be able to smoke his own sacred prayer pipe and offer his own prayers to the Great Spirit rather than have a chaplain offer his prayers by proxy.  (D.E. 37-1, pp. 7-8).

On January 15, 2013, Warden Monroe denied Plaintiff's Step 1 grievance noting that the grooming policy applied to all offenders regardless of their religious faith, that offenders were limited to what items could be carried outside of their cells, and that per revised TDCJ policy, only the chaplain/volunteer could smoke the sacred pipe.  (D.E. 37-1, p. 8).

On January 26, 2013, Plaintiff filed a Step 2 appeal of Grievance No. 2013058735.  (D.E. 37-1, pp. 5-6).  Plaintiff argued that the grooming policy requiring short hair was not the least restrictive means of balancing Plaintiff's right to practice his religion against the TDCJ's interest in security and that he should be allowed to wear a kouplock, a 2" x 2" wide strip of hair at the base of his skull that could grow continuously.  (D.E. 37-1, pp. 5-6).   Plaintiff claimed also that inspection of the medicine bags would not place any undue hardship or expense on prison security such that he should be allowed to continually wear his medicine bag as an exercise of his faith.  As to the communal pipe, Plaintiff argued that the TDCJ had allowed it for sixteen years, and that the federal prison system continued to allow Native American prisoners to partake in it.  (D.E. 37-1, pp. 5-6).

On March 27, 2013, the Region IV Grievance Coordinator denied the grievance as properly denied at Step 1.  (D.E. 37-1, p. 6).

**B.      Evidence related to development of challenged TDCJ policies.**

**(1)      The *Yellowquill* case.**

On April 13, 1995, Jolene Yellowquill, a Native American of Ojibwe heritage who was confined at a TDCJ unit in Gatesville, Texas, filed suit for injunctive relief in the United States District Court for the Southern District of Texas, Houston Division, seeking, *inter alia,* that the TDCJ be required to provide sacred pipe ceremonies to Native American adherents confined within the TDCJ.  *See Yellowquill v. Scott,* No. 4:95-cv-1080, D.E. 1, 63.  On May 22, 1997, the district court granted Yellowquill's motion for a temporary restraining order as it related to the communal pipe.  *Id*.; D.E. 71.  Thereafter, the parties reached a settlement.  *Id.;* D.E. 119.  Although *Yellowquill* involved only one inmate, the resulting settlement agreement served as the basis for the TDCJ to implement certain policies to address the practice of the Native American faith.

**(2)      The TDCJ Offender Orientation Handbook, Policies after *Yellowquill,* and the *Chance* Litigation.**

The TDCJ Offender Orientation Handbook (revised November 2004) (D.E. 37-7, pp. 1-17) includes a grooming policy mandating that all offenders maintain "good personal hygiene," brush their teeth daily, and be clean-shaven.  (D.E. 37-7, p. 8).  As to hair length, the grooming policy states:

Male offenders must keep their hair trimmed up the back of their neck and head.  Hair must be neatly cut.  Hair must be cut around the ears.  Sideburns will not extend below the middle of the ears.  No block style, afro, natural or shag haircuts will be permitted.  No fad or extreme hairstyles/haircuts are allowed.  No mohawks, tails, or designs cut into the hair are allowed.

(D.E. 37-7, p. 8)

The handbook also includes the TDCJ's tobacco policy which states that "[a]ll facilities within the TDCJ are designated as tobacco free," and warns that offenders found in possession of "tobacco products, paraphernalia or similar products may be charged with a disciplinary offense."[3]  (D.E. 37-7, p. 11).

In November 2008, the TDCJ Chaplaincy Department, in response to the *Yellowquill* litigation, revised the Chaplaincy Manual (CM), Policy 09.03 (rev. 4) to create an exception to the TDCJ tobacco ban for Native American adherents at pipe ceremonies. (D.E. 37-12, pp. 1-4.).

The policy provided in relevant part:

3.      TDCJ policy forbids the use or possession of tobacco in prison by offenders.  However, an exception to policy is in effect for Native American religious practitioners participating in the circle group prayer pipe ceremony of Native American-designated units/facilities.

                              .  .  .

5.      The Pipe ceremony will be conducted at a rate of no more than twice each month on Native American-designated units/facilities.  This is contingent upon availability of a qualified Native American chaplain, or a TDCJ approved volunteer, the pipe ceremony will be supervised and/or facilitated by one of these.

6.      The pipe ceremony will include tobacco or sage, sweet grass, kinnikinnick, or cedar.  These may be used in combination as prescribed by Native American tradition.

(D.E. 37-12, pp. 1-4) (emphasis in original).

---

[3] Effective October 13, 1997, the TDCJ banned the use of all tobacco products within its institutions, for both offenders and employees.  (D.E. 37-9, pp. 1-4, TDCJ Tobacco Policy, Rule § 151.25).

On June 16, 2011, William Chance, a Native American prisoner confined at the Michael Unit in Tennessee Colony, Texas, sued the TDCJ and certain prison officials in the United States District Court for the Eastern District of Texas, Tyler Division, alleging that he had been denied, *inter alia,* the right to participate in pipe ceremonies and smudging rituals in violation of RLUIPA and his First Amendment rights.  *See Chance v. Tex. Dep't of Criminal Justice,* No. 6:11-cv-435 (E.D. Tex. June 16, 2011) (complaint). Plaintiff Chance suffers from two serious infectious diseases, Hepatitis C and Tuberculosis.  Because of his communicable diseases, he could not smoke from the communal pipe used during pipe ceremonies so he sought permission to possess a personal pipe. *Id.*

In response to the *Chance* litigation, on September 8, 2011, a meeting was held with former TDCJ-CID Director Rick Thaler, Chaplaincy Director Bill Pierce, Program Analyst Clint Morris, and other officials to discuss the status of Native American contract chaplains, the possibility of hiring full-time chaplains, and Native American communal pipe services, including medical and sanitation issues, liability releases, protective covers for pipes, frequency of pipe services, costs of pipes, and the increase in Native American adherents over time.  (D.E. 38-9, pp. 1-5).  It was decided that only the Native American chaplain could smoke the ceremonial pipe at a pipe ceremony.  (D.E. 38-9, p. 5).    The chaplains were told that no offender was allowed to personally smoke the pipe in a pipe ceremony.  (D.E. 38-14, pp. 1-4) (October 12, 2012 Inter-Office Memorandum).  The memorandum states:

To ensure consistency among the Native American Pipe services the following information is being provided to clarify the handling of the pipe. Effective immediately, offenders participating in the Native American Pipe service will be allowed to handle the pipe prior to its lighting.   This was the practice on the majority of the units and will be the standard from this point forward.  The pipe can be the contract Native American chaplain's pipe or one donated to the unit.

The contract Native American chaplain or authorized Native American volunteer will be the only individual allowed to smoke the pipe.

Please note upon the notification that a unit has been quarantined for any reason, the handling of the communal pipe will cease until the quarantine has been lifted.

(D.E. 38-14, p. 3).

Robert J. Eason (Eason), TDCJ-CID Deputy Director – Prison and Jail Operations, reported on the medical barriers to communal pipe use and communicable illnesses in a prison setting.  (D.E. 40-18. pp. 1-22).  Further, Dr. Robert Williams, Deputy Director of TDCJ Health Services Division, opined that the communal pipe presents a "poor health practice" and an unnecessary risk of the spread "of all communicable diseases including influenza, norovirus, viral hepatitis (HAV, HBV, HCV), HIV, and herpes, among the prison population."  (D.E. 38-11, pp. 1-4).

In July 2012, the TDCJ revised CM Policy 09.01 to provide that "[o]nly the Native American chaplain/volunteer is authorized to smoke the pipe used for the pipe service." (D.E. 37-4, p. 3).

In July 2012, the TDCJ Chaplaincy Department revised Policy 05.01 regarding Religious Devotional Items and Observed Holy Days.  (D.E. 37-5, pp. 1-13).  CM Policy 05.01, Section II.D provides information about "Medicine Bags or Pouches" and states

that "[w]earing the bag or pouch is limited to the offender's cell or immediate bunk area in a dorm setting, and at religious services." (D.E. 37-5, p. 5).

## IV.    SUMMARY JUDGMENT STANDARD.

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). The Court may not weigh the evidence, or evaluate the credibility of witnesses. *Id.* Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions). Unauthenticated and unverified

documents do not constitute proper summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence . . . a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## V.   DISCUSSION AND ANALYSIS.

### A.   Threshold determinations.

**(1)   The *Chance* case and summary judgment.**

Plaintiff argues that there exists a genuine issue of material fact on the issue of least restrictive means, because the TDCJ followed more liberal policies in the past regarding the communal pipe, the TDCJ allows women prisoners to grow their hair, and other prisons allow certain practices that the TDCJ does not.  (D.E. 47-1, pp. 18-19).  However, a fact issue is not created simply because the TDCJ previously had a policy allowing a now-prohibited activity or because other correctional systems allow an activity that the TDCJ prohibits.  *See Chance v. Tex. Dep't of Criminal Justice,* 730 F.3d 404 (5th Cir. 2013).  In *Chance,* the plaintiff was seeking access to a sweat lodge, and he offered evidence that a federal correctional facility nearby provided such access.  *Id.* at 411.  The Fifth Circuit found the practices of other prison systems irrelevant, noting that a comparison of policies ignores "the differences between institutions and all the other factors that might be more relevant in a given case."  *Id.* (citing *Fowler v. Crawford,* 534 F.3d 931, 934 (8th Cir. 2008)).  The Fifth Circuit concluded that the mere existence of a prison policy that differs from a past policy or another institution's policy does not necessarily entitle a plaintiff to survive summary judgment on a RLUIPA claim.  *Id.*  The *Chance* court noted: "That TDCJ or other prisons have tolerated unsafe practices in the past is not a reason to permanently bind it to a dangerous policy."[4]  *Id.* at 412.  Rather, as

---

[4] Other circuit courts have rejected the adoption of a per se rule or bright-line test in evaluating RLUIPA's least restrictive means issue.  *See, e.g., Mays v. Springborn,* 575 F.3d 643, 647 (7th

discussed below, the RLUIPA analysis mandates a case-specific approach when analyzing the issue of least restrictive means on summary judgment.  Therefore, Plaintiff does not necessarily survive summary judgment simply because the TDCJ previously had more liberal policies or because other penal institutions provide more services and accommodations to offenders practicing the Native American faith.

**(2)     Substantial burden and sincerity of Plaintiff's beliefs.**

Defendants do not challenge the sincerity of Plaintiff's beliefs, but argue only that the policies at issue do not impose substantial burdens on the exercise of his faith.  There is no evidence to cast doubt as to the sincerity of Plaintiff's beliefs.

**B.     The RLUIPA Standard.**

With respect to its protection of institutionalized persons, the RLUIPA provides:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution … even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1)  is in furtherance of a compelling governmental interest; and

(2)   is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  Under the RLUIPA, the plaintiff bears the burden to prove that the challenged law, regulation, or practice substantially burdens his exercise of religion.  Once a plaintiff has made this prima facie showing, the defendant bears the burden to

---

Cir. 2009) (affirming summary judgment dismissing prisoner's free exercise claim where "the only evidence he produced was that the [forbidden items] were allowed at other prisons"); *Spratt v. R.I. Dep't of Corr.,* 482 F.3d 33, 42 (1st Cir. 2007) ("[E]vidence of policies at one prison is not conclusive proof that the same policies would work at another institution.").

prove that the challenged regulation is the least restrictive means of furthering a compelling governmental interest. *Id.,* § 2000cc-2(b). *See Sossamon v. Texas,* 131 S. Ct. 1651, 1656 (2011).

Despite RLUIPA's express purpose to protect the religious observances of institutionalized persons, the statute does not give courts carte blanche to second-guess the reasoned judgments of prison officials.   Congress anticipated that courts "would accord 'due deference to the experience and expertise of prison and jail administrators.'" *Cutter v. Wilkinson,* 544 U.S. 709, 716-17 (2005) (quoting 146 Cong. Rec. 16698, 16699 (2000) (joint statement of Sens. Hatch and Kennedy on the RLUIPA)).   The Supreme Court has cautioned that "[w]e do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety," and "an accommodation must be measured so that it does not override other significant interests." *Id.* at 722.   The Court further instructed:

We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a "compelling governmental interest" standard, context matters in the application of that standard.   Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions.   They anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

*Id.* at 722-23 (internal quotation marks and citations omitted).   However, this deference is not unlimited, and "policies grounded on mere speculation, exaggerated fears, or post-hoc

rationalizations will not suffice to meet the Act's requirements." *Rich v. Sec'y, Fla. Dep't of Corr.,* 716 F.3d 525, 533 (11th Cir. 2013) (internal quotation marks omitted).

**C.    Application of RLUIPA Standard to this Case.**

**(1)    The policies complained of present a substantial burden on Plaintiff's ability to practice his faith.**

Under RLUIPA**,** Plaintiff must initially demonstrate that a government practice imposes a "substantial burden" on his religious exercise.  The Court must determine: (1) whether the burdened activity is "religious exercise," and if so, (2) is the burden "substantial"?  *Adkins v. Kaspar,* 393 F.3d 559, 567 (5th Cir. 2004).  RLUIPA defines "religious exercise" to include "any exercise of religion," whether or not compelled by, or central to, a system of religious beliefs."  *Id.*  A government action or regulation creates a substantial burden on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs. *Id.* at 570.

Plaintiff is challenging the TDCJ's grooming policy that prohibits him from growing his hair, the religious objects policy that prohibits him from wearing his medicine bag at all times, and the pipe policy prohibiting him from partaking in the communal pipe.  (D.E. 47).  Plaintiff relates that, under the Native American faith, hair is considered a part of one's self and spirituality, and is to be cut only in times of mourning.  (D.E. 47, pp. 9-12). The TDCJ argues that long hair poses a security risk because it can be used to hide contraband and it exposes the person wearing it to harm.  (D.E. 37, pp. 41-44).

As to the medicine bag, Plaintiff explains that it contains sacred stones and items that protect him from evil spirits. (D.E. 47, pp. 20-24). The TDCJ maintains that it would be cost prohibitive to search the contents of each Native American adherent's medicine bag if the adherents are permitted to wear the bags outside of the cell or cell area. (D.E. 37, pp. 59-60).

Plaintiff contends that the purpose of the ceremonial pipe is to establish a personal relationship with the Creator through a direct dialogue which can only be accomplished by personally inhaling and exhaling the smoke. (D.E. 47, pp. 18-20). For the Spirits to answer a participant's prayers, he must make an offering to them by personally smoking the pipe. (D.E. 47, p. 20). Plaintiff also complains that his faith is practiced and reinforced in ceremonies and gatherings with other Native American believers, but the McConnell Unit has failed to provide even the minimal services described in its policies because it has failed to employ contract chaplains or locate volunteer chaplains to conduct and/or oversee ceremonies.

Given the Supreme Court's mandate to examine RLUIPA claims on a fact-specific case-by-case basis, the Court finds that Plaintiff has met his summary judgment burden to establish that the complained-of TDCJ policies and practices place a substantial burden on Plaintiff's religious exercise of his Native American faith.

**(2)     Least restrictive means.**

Because Plaintiff has established a substantial burden under RLUIPA, Defendants must demonstrate that the challenged policies are the least restrictive means of furthering a

compelling governmental interest.  42 U.S.C. § 2000cc-1(a); *Chance*, 730 F.3d at 410; *see Garner v. Kennedy,* 713 F.3d 237, 241-42 (5th Cir. 2013).

### (a)     *Wearing long hair or a kouplock.*

Robert Eason (Deputy Director — Prison and Jail Operations) testified that the grooming policy impacts the TDCJ's compelling interests in both security and costs.  (D.E. 40-18, pp. 15-21).  Eason stated that longer hair would result in increased searches and increased physical contact between officers and offenders in the "strike zone."  (D.E. 40-18, p. 15). Correctional officers are trained to keep an arms-length distance between themselves and offenders, and with an inmate's hair no longer than the collar, visible inspections are effective and the officer need not touch the inmate.   If an inmate is allowed to wear long hair or even a braid, the hair must be searched, thus diverting the attention of the officer from supervising the larger population to focus on a single prisoner.   In addition, searching an offender's hair takes time, and time pressures impact the entire unit schedule and the ability to move offenders.  (D.E. 40-18, p. 15).

Eason noted that long hair can be used against the offender if he is assaulted or otherwise engaged in a physical confrontation.  (D.E. 40-18, p. 16).  Long hair or a braid allows another inmate to grab the hair and control the victim.  Eason stated that the TDCJ is regularly sued by prisoners who allege failure to protect, and long hair exposes the TDCJ to increased liability.  Additionally, long hair would make identification of prisoners both in and outside of prison (in the event of an escape) more difficult.  (D.E. 40-18, p. 16).

Jennifer Gonzales (Gonzales), Assistant Budget Director of the TDCJ Business and Finance Division, calculated that the annual cost to search offenders' hair if all prisoners

were permitted to grow their hair past collar length would be approximately $147,460.00. (D.E. 40-16, p. 3).

The Fifth Circuit has effectively foreclosed Plaintiff's RLUIPA claim regarding the grooming policy and his desire to wear long hair.  In *Longoria v. Dretke,* 507 F.3d 898 (5th Cir. 2007), the plaintiff, an inmate of Mexican and Native American descent, requested permission to grow his hair because the Great Spirit instructed him to do so. He sued under RLUIPA and the district court dismissed the lawsuit as frivolous.  On appeal, the Fifth Circuit referenced its decision in *Diaz v. Collins,* 114 F.3d 69 (5th Cir. 1997), a case decided under the Religious Freedom Restoration Act (RFRA).  The Court held: "Because the test under RLUIPA is sufficiently the same as that previously imposed under RFRA, we hold TDCJ-ID did not violate Longoria's rights by, pursuant to the grooming policy, denying him permission to grow his hair." *Longoria,* 507 F.3d at 901.

In *Thunderhorse v. Pierce,* 364 F. Appx. 141 (5th Cir. 2010), the Fifth Circuit again relied on *Diaz* and noted:

… that prisoners may hide weapons and other contraband in their hair.  114 F.3d at 73.  In addition, requiring short hair makes it more difficult for an escaped prisoner to alter his appearance from photographs that the TDCJ periodically takes of each inmate.  *Id.*  In light of these concerns, we held that 'the security interest at stake cannot meaningfully be achieved appropriately by any different or lesser means than hair length standards.' *Id.*

364 F. Appx. at 146.  Thus, the Fifth Circuit has determined that even if the grooming policy interferes with a prisoner's right to practice his religion, the policy is the least restrictive means of furthering the TDCJ's compelling interest in security and managing

costs.   The evidence presented in this case falls squarely within that reasoning, and Plaintiff fails to establish that a genuine issue of a material fact exists.

Similarly, a kouplock raises the same security concerns and costs as does long hair.   The Fifth Circuit has held that RLUIPA "is not meant to elevate accommodation of religious observances over the institutional need … to control costs," and "controlling costs … involves compelling governmental interests."   *DeMoss v. Crain,* 636 F.3d 145, 154 (5th Cir. 2011) (quoting *Baranowski v. Hart,* 486 F.3d 112, 125 (5th Cir. 2007).   The TDCJ is not obligated to spend large amounts of money in order for Plaintiff to wear long hair or a kouplock.   The uncontroverted summary judgment evidence establishes that allowing long hair or a kouplock could increase the danger to correctional officers during a search as they must enter the "strike zone," increase the risk of serious injury to Native American offenders if attacked by other inmates, and lead to increased liability exposure to the TDCJ.   The grooming policy is the least restrictive means of promoting the TDCJ's compelling interests in security and costs.

*(b)      Medicine bags.*

Since 2009, the TDCJ Chaplaincy Department has included medicine bags and pouches as approved devotional items for offender possession.   (D.E. 37-13, p. 4).   However, "[w]earing the bag is limited to the offender's cell/dorm area in a dorm setting, and at religious services." (D.E. 37-13, p. 4).   Plaintiff testified that he can also wear his medicine bag on his way to and from services.   (D.E. 14, p. 3).   The policy provides that "[f]or religious reasons, any inspecting officer shall exercise care while performing a visual examination of contents and not touch the bag or its contents." (D.E. 37-13, p. 4).

Eason testified that if an offender is allowed to move about the prison with his medicine

pouch at all times, he would be at a greater risk of harm from other offenders, and would

also present additional work for security officials:

> … The ability to quickly and effectively search medicine bags is a basic
> correctional security need.  A bag or pouch which is not transparent and
> cannot be touched by a correctional officer becomes an ideal place to store
> contraband, particularly drugs or weapons.  A cell phone, or at the very
> least a SIM card could easily be stored within a medicine bag. Accordingly,
> TDCJ correctional officers regularly request offenders open and display the
> contents of the medicine bag during cell searches or when offenders are on
> their way to religious services.  These searches occur most commonly while
> offenders are en route to and from the weekly religious service.  The
> offender must place the bag in the view of the officer and remove the
> contents for examination.  The time an offender takes to perform this
> activity is generally longer than it would take an officer to perform the
> same process.  The offender must then replace the contents of the bag.

(D.E. 40-18, p.11).  Eason stated that the search of medicine bags is problematic because

offenders are very sensitive about the items in the bags being touched or mishandled, and

such searches can often lead to correctional officers being sued.   (D.E. 40-18, p.12).

Gonzales calculated the costs to search the medicine bags of fifty (50) offenders to attend

Native American services.  The cost is approximately $18.49 per service or $6,748.85

annually. (D.E. 40-16, p. 2.)

Allowing offenders to wear their medicine bags at all times necessarily increases

costs and time.  Defendants have established that TDCJ's policy which limits the wearing

of medicine bags to cell areas and to and from services is the least restrictive means in

relation to security and cost concerns.

(c)      *Smoking and/or possessing a pipe.*

After *Yellowquill,* Native American practitioners were permitted to personally smoke the communal pipe or a personal pipe if available.   However, several offenders filed grievances complaining about the risk of communicable disease transmission from a communal pipe.   TDCJ officials sought a medical opinion from Dr. Robert Williams, Deputy Director of TDCJ's Health Service Division.   *See Chance,* 730 F.3d at 413.   He opined:

> There is no way to share an object designed to be placed in one's mouth outside of a clinical setting with enough certainty that diseases cannot be transmitted for Health Services to advocate instituting this practice.  If it is determined that [TDCJ's] obligation to allow observance of this practice outweighs [TDCJ's] obligation to prevent spread of infection in our institutionalized setting, [TDCJ] will have to take as effective measures as are feasible, but it should be understood that the repercussions of this practice may extend beyond the participants since they would subsequently expose others with whom they have close contact to any disease they contracted from participating in the practice.

(D.E. 38-11, p. 3).  Based on Dr. Williams' recommendation, the TDCJ determined that it would no longer permit a communal pipe ceremony.   Rather, only the chaplain conducting the service would be allowed to smoke the pipe and pray on behalf of those present.   (D.E. 38-14, p. 2) (October 12, 2012 Inter-Office Memorandum).   The uncontested evidence establishes that the change in the communal pipe policy was based on the TDCJ's compelling interest in preventing the spread of diseases.

Plaintiff argues that the TDCJ's new pipe ceremony is an insufficient accommodation of his religious exercise under RLUIPA because personal participation in the pipe ceremony is essential.  (D.E. 47, p. 26 through D.E. 47-1, p. 9).   Conceding the medical concerns, Plaintiff argues that, with respect to the least restrictive means, Native American

adherents should be allowed to possess their own personal pipe, and the pipes could be stored by the prison chaplain in his or her office.

The TDCJ previously considered allowing the use of personal pipes, but concluded that the security risks and associated costs were too great, and that a pipe smoked only by the ceremony leader is the least restrictive means.  As discussed above, on September 8, 2011, Defendant Morris, Director Pierce, and numerous TDCJ officials met to discuss various issues concerning Native American ceremonies, including medical, sanitation, and security issues, and liability releases.  (D.E. 38-9, pp. 2-5).  At that time, pipe ceremonies were conducted at the Daniel Unit with a shared pipe, and the tobacco distributed for the pipe ceremony "kept disappearing."  (D.E. 38-9, pp. 2-3).  The group discussed personal pipes for Native American offenders, but concluded that personal pipes would create a security concern and burden, and the cost was too great.  (D.E. 38-9, pp. 4-5).  It was noted that the Cherokee Nation of Texas, the Lakota Nation, and the Apache Nation were not interested in assisting with the cost or donating personal pipes as they believed the offenders had "lost the right to take of the pipe."  (D.E. 38-9, p. 5).  The group reached a consensus that there be: (1) no communal offender pipes; (2) no offender-owned or possessed pipes; (3) no storage of offender-possessed pipes or pipe herbs by the TDCJ; and (4) one pipe ceremony per month, with smoking to be done only by the volunteer/chaplain.  (D.E. 38-9, p. 5).

Regarding individual pipes, Eason testified:  "Pipe ceremonies in which offenders are allowed to smoke and handle contraband, such as pipes, tobacco and fire starting materials present serious challenges to the safety, security, and operation of a unit."

(D.E. 40-18, p. 5).  The use of personal or disposable pipes would require spending considerable time to distribute, inventory, and track every pipe for every ceremony. (D.E. 40-18, pp. 5-7).  The pipes would have to be cataloged and stored, creating additional logistical problems.  Eason further stated that disposable pipes are not a feasible alternative because tobacco is banned in Texas prisons and is considered valuable contraband.  The TDCJ would have to devote extensive manpower to ensure that none of the pipe ceremony participants stole or hid a pipe.  (D.E. 40-18, pp. 5-7).  As to the McConnell Unit in particular, there are severe staff shortages due to the boom in the hydraulic fracturing industry in the Eagle Ford Shale.  TDCJ is not able to compete with the salaries associated with that work.  (D.E. 40-18, p. 14).

In *Chance,* the Fifth Circuit considered essentially the same evidence as is now before this Court regarding pipe ceremonies, including Dr. Williams' medical opinion and Eason's costs and security analysis.  730 F.3d at 412-414.  The Fifth Circuit concluded that the TDCJ had met its burden of establishing that the ban on communal and individual pipes and allowing only the ceremony leader to smoke the pipe at ceremonies was the least restrictive means to conduct pipe ceremonies, and accordingly, not in violation of RLUIPA.  *Id.*

In this case, the TDCJ has presented additional and more compelling evidence to support this same conclusion given the documented staff shortages at the McConnell Unit.  In addition, Defendants have offered evidence suggesting that, under the Native American faith system, a Native American may be prohibited from partaking in the sacred pipe while in prison.  (D.E. 38-12, pp. 3-10).  Chief Chari Bouse, a contract Native American

chaplain for TDCJ, reports that, after researching the issue, he found no tribes that would allow an offender inside the "Iron House" to smoke the sacred ceremonial pipe due to the negative or "dark winds" that preside there.  (D.E. 38-12, p. 6).  In addition, Chief Bouse attended a ceremony where the elders of the tribe smoked the pipe on behalf of the 3,000 attendees, refuting Plaintiff's allegation that he must personally partake in the pipe.  (D.E. 38-12, p. 6).  Further, Edward Hernandez, the chaplain for the Marlin Unit in Falls County, Texas, testified that he did not know of any tribe "…that believes that prayers to the Creator can only be conducted by personally smoking the Pipe."  (D.E. 40-10, p. 3). Defendants Stephens and Morris have offered unrefuted summary judgment evidence that the TDCJ's policy banning personal and communal pipes while allowing a contract chaplain to smoke the ceremonial pipe and to offer the prayers on behalf of the Native American offenders in attendance is the least restrictive means of conducting the sacred pipe ceremonies and does not violate RLUIPA.

### D.    First Amendment.

Plaintiff's allegations do not establish constitutional violations under the Free Exercise Clause.   The Supreme Court has made it clear that prisoners must be provided "reasonable opportunities" to exercise their religious beliefs.  *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam).  The Court has recognized, however, that limits may be placed on the religious rights that must be afforded to inmates.  In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court held "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," and "[w]hen a prison regulation impinges upon the inmates' constitutional rights, the regulation is valid if it is reasonably

related to legitimate penological interests." *Id.* at 89.  In determining the reasonableness of a regulation, the trial court should consider the following four factors: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) the alternative means of exercising the right that remain open to prison inmates; (3) the impact that an accommodation will have on guards and other inmates and on the allocation of prison resources generally; and (4) the absence of alternatives.  *Id.* 89-91.  Shortly after the *Turner* decision, the Supreme Court applied the test to uphold a prison policy that prevented inmates from attending Islamic prayer services in *O'Lone v. Estate of Shabazz*, 482 U.S. 382 (1987).  The Fifth Circuit subsequently added that the Supreme Court neither held any single factor to be dispositive, nor did it require all four factors to be met.  *Scott v. Miss. Dep't of Corr.*, 961 F.2d 77, 80 (5th Cir. 1992).  The first factor has been held to be controlling in these cases, and the other factors merely provide help in determining whether the connection is logical.  *Id.* at 81.  More recently, the Fifth Circuit reaffirmed the basic idea that rationality is the controlling factor.  *Mayfield v. Tex. Dep't of Criminal Justice*, 529 F.3d 599, 607 (5th Cir. 2008).

RLUIPA imposes a more stringent standard than that of the First Amendment.  *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008).  Because Plaintiff has not shown a violation under RLUIPA, he has not shown a violation of the Free Exercise Clause.  The Fifth Circuit has considered free exercise claims similar to Plaintiff's claims and has rejected them.  *See Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 860, 862-63 (5th Cir. 2004) (rejecting challenge to policy regarding volunteers); *Baranowski*,

486 F.3d at 121-22 (rejecting challenge to volunteer policy); *Thunderhorse,* 364 F. Appx. at 141 (rejecting requests for items to practice Native American faith, observance of holy days, and pipe ceremony).   As shown under the discussion of RLUIPA, there are valid rational connections between the challenged policies and practices and compelling governmental interests.   The first factor in the *Turner* analysis is satisfied with respect to all of Plaintiff's claims.   Thus, Plaintiff's First Amendment claims against Defendants are **DISMISSED with prejudice**.

**E.     First Amendment claims against Defendant Morris in his individual capacity.**

Plaintiff is suing Defendant Morris in his individual capacity for monetary damages for alleged violations of his First Amendment rights.   Plaintiff alleges that Morris arrived at the McConnell Unit in May 2009, and at that time, pipe ceremonies were authorized by TDCJ policy, but Morris failed to conduct a single pipe ceremony, in violation of Plaintiff's right to practice his Native American faith.   Plaintiff contends that Morris failed to perform the job for which he was hired, effectively denying Plaintiff the right to exercise his religious beliefs.  (D.E. 47-2, pp. 2-3).   Morris seeks to dismiss Plaintiff's claims on the grounds that Plaintiff has failed to raise a constitutional violation and that Morris's actions were objectively reasonable, such that he is entitled to qualified immunity.  (D.E. 37, pp. 62-77).

The defense of qualified immunity protects government officials performing discretionary functions from "liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 409

(5th Cir. 2009). Government employees are presumptively entitled to the defense of qualified immunity. Once asserted, the burden shifts to a plaintiff to demonstrate that qualified immunity does not bar recovery. *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992). A two-step process has traditionally been employed in evaluating the defense of qualified immunity. *Saucier v. Katz*, 533 U.S. 194 (2001). Under the traditional approach, a court must first consider whether "the facts alleged show the officer's conduct violated a constitutional right." *Id.* at 201. Second, courts are required to decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id.*; *see also Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011). "To be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citations omitted). The Fifth Circuit has specified that the issue for a court's consideration with respect to the second step is whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question. *Short v. West*, 662 F.3d 320, 325 (5th Cir. 2011) (citations omitted). Conclusory allegations of wrong-doing fail to satisfy both the first and second requirement. *Geter v. Fortenberry*, 849 F.2d 1550, 1553 (5th Cir. 1988). More recently, the Supreme Court held that a case may be dismissed based on either step in the qualified immunity analysis: "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in the light of the circumstances in the

particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Short*, 662 F.3d at 325.

The summary judgment evidence establishes that Defendant Morris did not violate Plaintiff's First Amendment rights by failing to conduct pipe ceremonies at the McConnell Unit when such ceremonies were authorized by TDCJ policy.[5]  Following the *Yellowquill* litigation, sometime in 2009, the TDCJ made an exception to its tobacco ban to allow Native American adherents to partake in pipe ceremonies.  However, the fact that inmates were permitted to participate in smoking the pipe did not address or remedy the issues that have routinely plagued the TDCJ Native American chaplaincy: the ability to secure qualified chaplains and/or volunteers to conduct the ceremonies at the various units.

Morris is a Program Supervisor III – Rehabilitation Programs Division of the TDCJ. (D.E. 40-12, p.2).  Morris is not qualified to conduct the pipe ceremonies.  (D.E. 40-12, pp. 2-7).  According to his affidavit, Morris has worked diligently at attempting to find and secure Native American teachers who can perform ceremonies and minister to the McConnell Unit Native American faith community, and Plaintiff has no evidence to refute this testimony.

As noted above, the First Amendment requires only that prisoners be provided "reasonable opportunities" to exercise their religious beliefs.  *Cruz*, 405 U.S. at 322. Plaintiff testified that he was able to study and learn about his faith from another prisoner,

---

[5] In July 2012, the TDCJ banned inmate smoking of the sacred pipe during ceremonies.  (D.E. 37-4, p. 3).  Plaintiff filed his lawsuit on May 28, 2013, almost one-year after the ban had been in effect.  Applying the two-year limitations period, Plaintiff's claims for damages could arise only between May 28, 2011 through July 2012.

attend circle meetings, possess a medicine bag, and celebrate holy days.  In March 2010, Morris hired Dr. Robert Pierce as the contract chaplain.  (D.E. 40-12, p. 4).  Dr. Pierce (now deceased) testified that he never conducted a pipe ceremony while at the McConnell Unit because he did not personally meet the qualifications of a "Pipe Holder." (D.E. 40-9, p. 3).  According to Dr. Pierce, "The [pipe] ceremony should be conducted by a Pipe Holder who has studied for many years with a tribal elder who is also a Pipe Holder." (D.E. 40-9, p. 3).   In addition, Dr. Pierce found that the offenders did not have sufficient knowledge of Native American history, culture, spirituality, and customs, and that more education would be beneficial before partaking in a pipe ceremony.  (D.E. 40-9, p. 3).

The uncontested evidence establishes that Morris worked diligently to meet the religious needs of the TDCJ Native American community.  Plaintiff has not offered any evidence to suggest that Morris engaged in any actions that were objectively unreasonable in light of clearly established law.  Morris is entitled to summary judgment based on qualified immunity to the extent Plaintiff has sued him in his individual capacity for monetary damages.

## VI.   CONCLUSION.

The summary judgment evidence establishes that the TDCJ policies challenged by Plaintiff -- the grooming policy, the medicine bag policy, and the Native American pipe policy -- all impose substantial burdens on Plaintiff's religious exercise.  However, the TDCJ has established with an abundance of uncontested and unchallenged evidence that the policies are the least restrictive means of furthering the TDCJ's compelling interests

in maintaining security and monitoring costs.  Thus, Plaintiff's claims under RLUIPA fail.  Moreover, because the protections offered by the First Amendment are more limited than those extended under RLUIPA, Plaintiff's First Amendment claims also fail. Accordingly, Defendants' motion for summary judgment (D.E. 37) is **GRANTED**, and Plaintiff's claims against Defendants in their official capacities, and against Morris in his individual capacity, are **DISMISSED with prejudice.**

ORDERED this 27th day of March, 2015.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE